TEAKLE *v.* MOORE.

1. BUILDING CONTRACTS — EXTRA WORK — AUTHORITY OF ARCHITECT.

Where all of the contracts for the different portions of the work on a building referred to the supervising architect as the agent of the owner, and recognized his authority to order extra work, and such architect, in order to expedite the construction of the building, which had been delayed, entered into an arrangement with the contractor for the woodwork whereby the latter was to erect a scaffold for the use of the other contractors, but not necessary for his own use, and the owner was to pay therefor, the other contractors consenting to the deduction of the cost from their payments, the owner was bound by such agreement, though each contract provided that the contractor should furnish his own scaffolding.

2. SAME—DESTRUCTION OF BUILDING.

One who contracts, for a gross sum, to do the carpenter work on a building, payments to be made from time to time as the work progresses, reserving 10 per cent. until 10 days after completion, may, on the falling of the roof through the negligence of the owner's agent, recover for the part of the work done, though it be injured by the fall.

3. SAME—CONSTRUCTION OF CONTRACT—SPECIFICATIONS.

A condition contained in the general specifications for a building, furnished for the guidance of bidders, but not found in the carpenter's specifications and contract, nor specifically referred to therein, forms no part of such contract.

4. SAME—EXTRA WORK—NOTICE OF CLAIM.

A provision in a building contract that no claim shall be made

for additional work unless done pursuant to an order from the architect, and that notice of all claims shall be given to the architect in writing within 10 days after the commencement of the work, does not make such notice a prerequisite to the validity of a claim, but if the architect gave an order for such work, knew of its commencement and progress, and has certified to its performance, a recovery may be had therefor.

Error to Wayne; Hosmer, J. Submitted June 5, 1902. (Docket No. 43.) Decided September 17, 1902.

*Assumpsit* by Robert T. Teakle and George W. Golden, copartners as Teakle & Golden, against James H. Moore, for labor performed and materials furnished in the construction of a building. From a judgment for plaintiffs on verdict directed by the court, defendant brings error. Affirmed.

*Brennan, Donnelly & Van De Mark* and *Henry L. Lyster*, for appellant.

*Maybury & Lucking*, for appellees.

MOORE, J. Prior to July 28, 1898, the defendant had caused plans to be prepared, and entered upon the construction of a theater building on Monroe avenue, Detroit. Six different contracts were made between defendant and others for the construction of different portions of the work, which contracts were similar in form and conditions to a contract entered into between him and the plaintiffs on the 28th of July, 1898. Contracts for the masonwork, the ironwork, and some other portions of the work were made before the contract with the plaintiffs was made. The material portions of the contract are as follows:

"JOHN SCOTT & CO.,
    "Architects,
    " Detroit, Mich.

"This agreement, made the twenty-eighth day of July, in the year one thousand eight hundred and ninety-eight, by and between Teakle & Golden, of the city of Detroit,

county of Wayne, and State of Michigan, parties of the first part (hereinafter designated the 'contractors'), and James H. Moore, of the city of Detroit, county of Wayne, and State of Michigan, party of the second part (hereinafter designated the 'owner'),   *   *   *.

"The contractors shall and will well and sufficiently perform and finish, under the direction and to the satisfaction of John Scott & Co., architects (acting as agents of said owner), all the work included in the carpenter and joiner work and hardware of a theater building to be erected on the north side of Monroe avenue, between Campus Martius and Farmer St., in the city of Detroit, county of Wayne, and State of Michigan, agreeably to the drawings and specifications made by said architects (copies of which have been delivered to the contractors), and to the dimensions and explanations thereon, therein, and herein contained, according to the true intent and meaning of said drawings and specifications and of these presents, including all labor and materials incident thereto, and shall provide all scaffolding, implements, and cartage necessary for the due performance of the said work.

"Should it appear that the work hereby agreed upon and intended to be done, or any of the matters relative thereto, are not sufficiently detailed or explained on the said drawings or in the said specifications, the contractors shall apply to the architects for such further drawings or explanations as may be necessary, and shall conform to the same as part of this contract, so far as they may be consistent with the original drawings; and, in event of any doubt or question arising respecting the true meaning of the drawings or specifications, reference shall be made to the architects, whose decision thereon shall be final and conclusive.    It is mutually understood and agreed that all drawings, plans, and specifications are and shall remain the property of the architects.

"Should any alterations be required in the work shown or described by the drawings or specifications, a fair and reasonable valuation of the work added or omitted shall be made by the architects, and the sum herein agreed to be paid for the work according to the original specifications shall be increased or diminished, as the case may be.
*   *   *

"The contractors shall and will proceed with the said work, and every part and detail thereof, in a prompt and diligent manner, and shall and will wholly finish the said work according to the said drawings and specifications,

and this contract, on or before the first day of October, in the year one thousand eight hundred and ninety-eight, and, in default thereof, the contractors shall pay to the owner —— dollars for every day thereafter that the said work shall remain unfinished, as and for liquidated damages.

"Should the contractors be obstructed or delayed in the prosecution or completion of the work by the neglect, delay, or default of any other contractor, or by any alteration that may be required in the said work, or by any damage which may happen thereto by fire, or by the unusual action of the elements, or by the abandonment of the work by the employés through no default of the contractors, then there shall be an allowance of additional time beyond the date set for the completion of said work.    *    *    *

"The contractors shall make no claim for additional work unless the same shall be done in pursuance of an order from the architects, and notice of all claims shall be made to the architects in writing within ten days of the beginning of such work.    *    *    *

"And it is hereby mutually agreed between the parties hereto that the sum to be paid by the owner to the contractors for said work and materials shall be two thousand and sixty-two ($2,062) dollars, subject to additions or deductions on account of alterations as hereinbefore provided, and that such sum shall be paid in current funds by the owner to the contractors in installments as follows: From time to time as the work progresses, reserving 10 per cent.; it being understood that the final payment shall be made within ten (10) days after this contract is completely finished: *Provided*, that in each of the said cases the architects shall certify in writing that all the work upon the performance of which the payment is to become due has been done to their satisfaction.    *    *    *

"And the said owner hereby promises and agrees with the said contractors to employ, and does hereby employ, them to provide the materials and to do the said work according to the terms and conditions herein contained and referred to, for the price aforesaid, and hereby contracts to pay the same at the time, in the manner, and upon the conditions above set forth."

Attached to this contract were specifications dated July 9, 1898, entitled "Carpenter Specifications," etc. Before the contract had been made, "general specifications" had

been furnished to all the contractors, to enable them to make their bids. One of the conditions attached to the general specifications reads:

"The owner and architects shall have full power to make any alterations during the progress of the work which they may deem necessary or advisable, and such alterations shall not affect or make void the contract.

"No claim for extra work shall be considered unless the price for the same shall have been agreed upon in writing between the owner and architects prior to the commencement of the same. In the case of work being omitted, a deduction shall be made from the amount of the contract at the same rate as provided in the contract for similar work."

No such condition was attached to the "carpenter specifications."

The plaintiffs had done a small amount of work before the contract was entered into. After the contract was made, they entered upon its performance. The various contractors were to erect such scaffolding as their work made necessary. It is the claim of plaintiffs that the work which should have been done prior to their work was delayed; that, for the purpose of hastening this work, they were requested by the architect to build a large scaffold, which could be used by the other contractors, but which was not necessary to enable plaintiffs to perform their contract; and, in reply to their inquiry as to who would pay for it, they were assured that Mr. Moore would pay for it. The testimony of the architect does not differ materially from the testimony of the plaintiffs. Among other things, he testified:

" *Q.* Did you have any authority from Mr. Wiggins or Mr. Moore to order a scaffold there? (Objected to as incompetent, and exception noted.)

"*A.* I had no special—no authority from them.

" *Q.* Was the scaffold a part of the plans and specifications?

"*A.* The scaffold was necessary for the carrying out of the work.

" *Q.* Was it a part of the plans and specifications?

"*A.* The scaffold was necessary to carry out portions of the work, and in that way would be part of the plans and specifications.

"*Q.* Mr. Scott, the contract entered into by the different parties provided that the scaffold should be furnished and provided by the contractors, did it not?

"*A.* Yes, sir.

"*Q.* And no expense whatever was to be fixed upon the owner?

"*Mr. Lucking:* Objected to. As far as that is concerned, part of the contracts had never been let at this time that they undertake to charge part of this to.

"*The Court:* You heard the testimony of Mr. Golden on that subject as to the general order. Did you give a general order to build the scaffold for the expedition of the building?

"*A.* Yes, sir. Well, I gave the order to build the scaffold; yes, sir.

"*Q.* Did you have any order from Mr. Wiggins or Mr. Moore to do that?

"*A.* No, sir; not at that time.

"*Q.* Did you state to Mr. Teakle or Mr. Golden, at the time they were building this scaffold, that it was to be paid for by the other contractors?

"*A.* I stated to Mr. Golden that I wanted the scaffold built, and that the cost would be charged up against the different contractors. That is the sum and substance of what I said to him, as far as I remember. I may have told him that I would see that it was deducted from them out of their contract price. I presume I may have done so, but I do not remember exactly our exact words. I did not have any consent in writing from the owner to order that work. * * *

"*Q.* Did you, in your judgment, consider it a good move to build that scaffold to hurry the construction? (Objected to on the ground that he built the scaffold, according to his own statement, for the contractors. Objection overruled. Exception for defendant.)

"*A.* Yes, sir. In this certificate it is stated that the accounts were to be charged to certain contractors, and to be deducted from their contracts. That was my understanding with the contractors, that they were to pay their share of it, and I was to deduct it from their contracts, and pay it to Teakle & Golden.

"*Q.* And you, of course, were acting for Mr. Moore?

"*A.* I was architect of the building.

"*Q.* Well, you were acting for Mr. Moore in that respect? Nobody else could have deducted it out of their contracts, could they?

"*A.* No. I never told Teakle & Golden that they would have to look to those contractors for their pay. I do not remember telling Mr. Golden whom he was to get his pay from. I know I ordered the work. I do not remember that there was any question raised about the pay part of it in the beginning. I intended to deduct it from the contracts; that Mr. Moore should deduct it from the contracts.

"*Q.* And Mr. Moore pay it to Teakle & Golden; isn't that so?

"*A.* Well, yes; that would be the way that I should do it. Mr. Thompson agreed with me to allow me to deduct his share out of his account. He had charge of the ironwork. Mr. Stapleton agreed to pay, as plasterer, a *pro rata* portion. They all agreed to that. The *pro rata* would be fixed by general agreement among all the contractors. * * * In making the arrangement for this scaffold as general superintendent of the building, I felt that the owner would not lose anything in that way if I took the total amount of it out of certain contracts, and paid it to the other people; and, if the building had gone along without the disaster, there probably never would have been any trouble about it.

"*Q.* And, as general superintendent over all those contractors, you felt it was fully within your powers to do that, didn't you?

"*A.* Yes, I felt I had authority to do it."

The plaintiffs entered upon the construction of this scaffold. On the 5th of November, 1898, the roof of the building fell. The record does not disclose the extent of the injury, or whether all the work performed by the plaintiffs was destroyed or not. After the roof fell, the original architects did no more work upon the building, only to help take care of the property for three or four weeks thereafter. A new architect was put in charge. The effect of the falling of the building was to make it impossible for the plaintiffs to complete their contract in the fall. Instead of the defendant going on with the completion of the building, a company was formed, known as the "Wonderland

Company, Limited." What the relations of Mr. Moore were to this company does not appear. After the building fell, an itemized statement of account was made, and presented to the original architects, who indorsed it:

"The above work, amounting to $1,237.82, was performed in accordance with the plans and specifications on Wonderland Building up to November 4th, 1898. The amount for scaffold, $684.90, is to be charged to the Peninsular Engineering Co., Alphonse De Mann, W. S. Stapleton, Electric Wire & Repair Co., and Wm. Wright Co., and deducted from their contracts."

Demand was made upon the defendant, who refused to pay the account, except $280. In the meantime building material had increased in price. The following notice was sent:

"NEW WONDERLAND THEATRE,
          "Detroit, Mich.
"The Wonderland Co. (Limited),
          "Proprietors.
                    "DETROIT, MICH, July 18, 1899.
"Messrs. TEAKLE & GOLDEN,
          "Contractors.
"*Gentlemen:* Referring to the statement of your Mr. Teakle, made to me some days ago, that unless you were paid for or guaranteed the payment for the scaffolding originally built by you in the Wonderland Theatre Building, you would not go on with your contract for the carpenter work on said building, I am instructed by the Wonderland Co., Ltd., to notify you that they will not ·pay for or guarantee the payment for said scaffold, and, assuming that your decision in the matter was final, to notify you that, unless you signify your intention in writing to go on with said work within 24 hours from receipt of this, they will make arrangements with some other party to complete your contract.
                    "Sincerely yours,
                         "J. M. WOOD,
                              "Architect."

This suit was brought. After considerable testimony was put in by the plaintiffs, the following admission was made in open court:

" We admit that the scaffold, as charged for in accordance with the bill, is $684.91; that the amount of work performed under the contract, according to the plaintiffs' charges, amounts to $316.16; and that the balance, $284.26 worth of work, was done outside of the contract, and outside of the scaffold, of course, for which last amount we are liable. The other two amounts we contest."

Several witnesses were sworn in defense. It is not made to appear very clearly what caused the roof to fall. It was stated on the cross-examination by Col. Wood:

"I looked over the ruins with a view to ascertaining the cause of the fall of the roof. I studied it as an expert.

" *Q.* Will you state to the jury the cause of the fall of the roof? (Objected to as incompetent and immaterial. Exception noted.)

" *A.* I stated at the inquest that it was my belief that the fall of the roof was due to improper design in the construction of the trusses, and the carelessness in the supervision of the details. That was very apparent."

The record does not show that any requests to charge were presented to the trial judge. He was of the opinion that, under the facts disclosed by the record, the plaintiffs were entitled to recover the full amount of their claim. The case is brought here by writ of error.

It is claimed that, as each contractor had agreed to furnish his own scaffolding, Mr. Scott was not authorized to make the contract he did. We cannot agree with counsel. Scott & Co. were the supervising architects. They were described in all the contracts as "acting as agents of said owner." The plaintiffs' contract provided that their work should be completed by October 1st. It is evident from the situation when the roof fell that the work necessary to be done before the carpenter work could be completed was delayed. The architects were acting for the owner in all the contracts. It is perfectly apparent that if, instead of each contractor putting up and taking down such scaffolding as he might need, a scaffold should be built that would answer the needs of all the contractors, it would save expense and expedite the work. We think

the architects, for the purpose of accomplishing this, might arrange that the carpenters should put up this scaffold, that Mr. Moore should pay them, and, by agreement with the other contractors, the cost should be *prorated* among them, and deducted from the amount to be paid upon their several contracts. Had the roof not fallen, just this would have been done, and no question raised.

Defendant claims, where a building in process of erection is destroyed without the fault of either the owner or contractor, neither party can recover from the other on a nonapportionable contract, and that this is a nonapportionable contract; citing *Fildew* v. *Besley*, 42 Mich. 100 (3 N. W. 278, 36 Am. Rep. 433), and a great many other cases. The authorities are not in harmony with the contention of counsel. See *Cleary* v. *Sohier*, 120 Mass. 210; *Lord* v. *Wheeler*, 1 Gray, 282; *Butterfield* v. *Byron*, 153 Mass. 522 (27 N. E. 667, 12 L. R. A. 571, 25 Am. St. Rep. 654); *Clark* v. *Busse*, 82 Ill. 515; *Rawson* v. *Clark*, 70 Ill. 656; *Schwartz* v. *Saunders*, 46 Ill. 18; *Cook* v. *McCabe*, 53 Wis. 250 (10 N. W. 507, 40 Am. Rep. 765); *Clark* v. *Franklin*, 7 Leigh, 1; *Hollis* v. *Chapman*, 36 Tex. 1. We do not think it necessary upon this record to try to harmonize them or to decide between them. It is believed the cases cited may be distinguished from the case at bar. In all of them it was admitted or proven that the building was totally destroyed without the fault of the owner. In *Brumby* v. *Smith*, 3 Ala. 123, great stress is laid upon the fact that payment was not to be made until the work was completed, and, as the work was never completed, payment did not become due under the contract. In the case of *Siegel, Cooper & Co.* v. *Eaton & Prince Co.*, 165 Ill. 550 (46 N. E. 449), it appeared that the premises were totally destroyed by fire without the fault of the owner. In that case, as to the work upon which a payment was due at the time of the fire, plaintiff was allowed to recover. As to the balance the court held that, as payment was not to be made until the elevator was put in running order, and as it was

never put in running order, that payment did not become due by the terms of the contract.

In the case of *Fildew* v. *Besley*, 42 Mich. 100 (3 N. W. 278, 36 Am. Rep. 433), the agreement was for a completed building, for which was to be paid $250. In disposing of the case the court said:

"It certainly does not clearly appear but that the contractors might yet go on and substantially perform the agreement on their part. This addition formed a complete building of and by itself. True, it was to be attached in part to the old, but not in so essential a manner as to prevent the erection thereof without the support which it would otherwise have derived therefrom. This work could have been carried on and fully performed without any reference to the main building in any important particular. A removal of the main building by the owner thereof would have excused the contractors from connecting this addition therewith, but would not have prevented their recovering the full contract price had they in all other respects complied with their agreement."

In the case at bar plaintiffs were not to make a completed building; they were to construct simply a portion of it. It is not made to appear that the building was wholly destroyed, and, as to the damage which was done, that it was without the fault of defendant. While very little proof was offered upon that subject, what appears is to the effect that the casualty was caused by improper designs and careless supervision by the persons designated in the contract as "acting as agents of said owner." The contract also provides that payment for the work shall be made from time to time as the work progresses, reserving 10 per cent., the final payment to be made within 10 days after the contract is completely finished. Take it altogether, it is a very different case from those cited by counsel.

It is said, as there was no agreement made in writing between the owner and the architects for the price of the extra work prior to its commencement, as provided in the condition attached to the general specifications, there can

be no recovery. That condition was not attached to the "carpenter specifications," which were attached to the contract for the guidance of the plaintiffs, and we do not think it was any part of the contract.

It is also urged that, as there was no notice of plaintiffs' claim given to the architects within 10 days of the beginning of the extra work, there can be no recovery. We do not so construe the contract. It provides that the contractors shall make no claim for additional work unless the same shall be done in pursuance of an order from the architects, but it does not make it a prerequisite to the validity of such a claim that notice in writing of the claim shall be given to the architects within 10 days of the beginning of such work. In this case it clearly appears that the order for the work was given by the architect; that he knew of its commencement and progress; that he afterwards certified that it was performed in accordance with the plans and specifications. It is not made to appear that any error was committed for which the case ought to be reversed.

Judgment is affirmed.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred.